# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**GERALD ULIBARRI and**
**WHITE RIVER ROYALTIES, LLC,**

      Plaintiffs,

v.                                                   **No: 1:16-cv-215-RB-JHR**

**SOUTHLAND ROYALTY COMPANY,**
**LLC,**

      Defendant.

                                                 **Consolidated for purposes**
                                                 **of class certification with:**

**GERALD ULIBARRI,**

      Plaintiff,

v.                                                   **No: 1:18-cv-294-RB-SCY**

**ENERGEN RESOURCES**
**CORPORATION,**

      Defendant.

## MEMORANDUM OPINION AND ORDER

In this dispute over the calculation of natural gas royalty payments, Gerald Ulibarri and White River Royalties, LLC (Plaintiffs) seek to bring their claims on behalf of a putative class of similarly situated leaseholders. Their proposed class includes all individuals or entities that Defendant Southland Royalty Company, LLC (Southland) has paid royalties pursuant to lease agreements containing certain types of royalty provision language. Plaintiffs hired a landman, Terry A. Moores, to conduct chain of title work to determine which individuals and entities have held lessors' interests in the relevant leases since January 1, 2015. Southland argues that Mr. Moores's chain of title opinions are unreliable in various respects and his report and testimony

should be excluded from the Court's class certification analysis.[1] Having considered the submissions of counsel and relevant law, the Court will **deny** Southland's motion.

I.   Background

   A. The Underlying Complaint and Proposed Class

Southland holds the lessee's interest in numerous lease agreements under which it produces natural gas from "gas only" wells in New Mexico. (Docs. 99 at 3; 106 at 11.) Plaintiffs hold the lessors' interests in several such lease agreements. (Doc. 99 at 3–4.) They allege that, since January 1, 2015, Southland has consistently underpaid royalties it owes on the sales proceeds of natural gas and related products produced under these lease agreements by not basing payments on the actual sale proceeds of the natural gas products. (*See id.* at 8.) Instead, they argue, Southland undervalues the natural gas products and consistently deducts "post-production costs," like treatment and processing, from their royalty payments. (*See* Doc. 106 at 2.) Plaintiffs allege that, pursuant to their lease agreement language, their royalty payments are meant to be calculated solely based on sale proceeds and not adjusted for the cost of post-production processing. (*See id.*)

Plaintiffs seek to bring this action on behalf of a putative class including all individuals and entities who have been paid royalties by Southland at any time since January 1, 2015, and hold a lessor's interest in a lease agreement that contains one of four different types of royalty payment provisions.[2] (*See id.* at 1–3.) The four types of royalty provisions that delineate the proposed class include: "proceeds royalty provisions," "gross proceeds royalty provisions," "greater of market

---

[1] Southland's motion to exclude Mr. Moores's testimony was filed and briefed prior to the Court's order consolidating *Ulibarri v. Southland Royalty Co., LLC*, 16cv0215, and *Ulibarri v. Energen Resources Corp.*, 18cv0294. (*See* 16cv0215, Doc. 155; 18cv0294, Doc. 87.) As the cases have now been consolidated for purposes of the class certification proceedings, the reasoning and rulings in this Memorandum Opinion and Order will apply equally to both cases in this consolidated class certification proceeding. All documents cited herein refer to 16cv0215.

[2] Plaintiffs have given each type of royalty provision a short title, which Southland has also adopted for ease of reference. For a more detailed description of the exact royalty language contained in each type of provision, see the Court's March 15, 2019 Opinion. (Doc. 151 at 3–4.)

value or gross proceeds royalty provisions," and "gross proceeds without deduction of post-production costs royalty provisions." (*See id.* at 3.) The definition excludes "any person or entity who has been a working interest owner in a well located in New Mexico on whose behalf Southland paid royalties on natural gas produced by Southland in New Mexico . . . ." (*Id.*)

In their first set of interrogatories, Plaintiffs asked Southland to use the proposed class definition to "[i]dentify, in an electronic format or database, the names, last known telephone numbers, and last known addresses of the Plaintiff and the Proposed Class Members, and each well name and Southland internal identification number . . . for which [it] paid such Plaintiff and the Proposed Class Members Royalties." (Doc. 126-1 at 2.) Southland objected, asserting that it did not possess the information necessary to determine the putative class members' identities. (*See id.* at 3.) Southland asserted that it could tie a particular lease to a particular well, and a particular well to a particular royalty recipient. (*Id.*) However, because multiple leases may cover a single well, they lacked information to definitively tie particular leases to particular royalty payments. (*See id.*) Southland argued that connecting specific royalty payments to the underlying lease requiring that payment would be unduly burdensome and costly because "[t]he only way this determination can be made is by review of all title instruments in the county records relating to the Subject Leases." (*Id.*) According to Southland, "[s]uch a task would require hiring a title expert to review all of the relevant county records and to establish the chain of title stemming from interests in all of the Subject Leases." (*Id.*)

**B. Terry Moores's Proffered Expert Testimony**

Plaintiffs subsequently retained Mr. Moores "to conduct the title examination work which Southland stated was necessary in order to properly identify the persons who have been lessors of

record under each of the 325 Lease Agreements . . . ." (Doc. 126 at 2.)[3] Mr. Moores is a landman who currently works as a managing member of SandStoneLand, LLC—an independent landman firm specializing in the four corners region and Wyoming. (*See* Doc. 126-3.) He has decades of similar experience performing title examination and land work contracting services for various clients. (*See* Docs. 126 at 3; 126-3.)

Mr. Moores's opinions are based on a list of leases that were assigned to Southland by Energen Resources Corporation on January 1, 2015, and contain royalty provision language falling under one of the four relevant categories. (*See* Doc. 126-2 at 2–3.) Southland produced these leases during discovery. (*See id.*) To conduct his title examination of each lease, Mr. Moores relies on public recordings of transfers, assignments, and conveyances in county records to determine individuals and entities holding lessors' interests in the lease since January 1, 2015. (*See* Docs. 126 at 4; 126-2 at 1–2.) According to Mr. Moores's report, each of the relevant leases "are public[ly] recorded in either the San Juan County Recorder's Office or the Rio Arriba County Recorder's Office." (Doc. 126-2 at 3.) Mr. Moores utilizes each county's grantor/grantee index to complete his title work—a resource in which recorded and filed leases are indexed "chronologically by Grantor's and Grantee's last name in a series of time separated index books," and also indexed alphabetically by the grantor's last name.[4] (*Id.* at 4–5.)

Mr. Moores's methodology for identifying post-2015 leaseholders includes ascertaining the original lessor and the date the original lease was executed, then checking the indexes "looking

---

[3] Plaintiffs often refer to the leases it has identified to define the putative class as "the 325 Lease Agreements." (*See, e.g.*, Doc. 106 at 2 ("[t]he named Plaintiffs and the Class claim that Southland has breached the lease agreements at issue ('the 325 Lease Agreements')").)

[4] Mr. Moores describes employing this process in doing title work for the leases located in San Juan County and explains that, while he has used the same methodology for his title work in Rio Arriba County, the records there are harder to examine based on various issues with the lease descriptions and the County's organizational system. (*See* Doc. 126-2 at 6–7.) Due to these difficulties, Mr. Moores had been unable to finish his review of the leases in Rio Arriba County by the date of his initial report. (*See id.*)

forward from that date for the name of the original lessor . . . ." (*Id.* at 5.) "Each time I find a new Grantee . . . we will begin this same process for all Grantees for all the conveyances that pertain to the subject legal disruption we find up to the date of January 1, 2015." (*Id.*) Mr. Moores plans to use other internal documents produced by Southland, including title opinions and division orders, to further cross-check his work, but had not begun that process at the time he filed his initial report. (*Id.* at 5–6.) Mr. Moores also opines that while his methodology is "comprehensive and has allowed [him] to identify hundreds of current lessors, [he] will not be able to identify each current person or entity who has held or holds a lessor's interest" in the relevant leases for a variety of reasons. (*Id.* at 9.) For example, some lessors use middle names or nicknames on conveyance documents, many of the original lessors are deceased, and some conveyance documents don't specify the percentage of an interest being conveyed. (*See id.*)

Mr. Moores's report notes that Plaintiffs' counsel also requested he identify overriding royalty interest holders on the same leases. (*Id.* at 8.) He plans to conduct that title work using the same grantor/grantee index methodology, as well as by consulting a "tract index" through a title company "to research any additional conveyances which involve the creation or assignment of an overriding royalty interest." (*Id.*) As of the date of his initial report, Mr. Moores had not yet begun the work of determining overriding royalty interest holders, but stated that he would begin such reviews after finishing his research on lessors' interests. (*Id.* at 8–9.) As of February 1, 2019, Mr. Moores had still not completed his title search to identify individuals and entities holding lessor's interests in the relevant leases. (Docs. 126 at 4.)

Mr. Moores attached a summary of his findings to his report ("the summary"), which:

[I]dentifies the date the original lease was executed, the name of the original lessor(s), the name of the original lessee, the name(s) of the lessor(s) who held the lessor's interests under each applicable oil and gas lease as of January 1, 2015, and

5

if applicable the name(s) of the lessor(s) who acquired the lessor's interests under the oil and gas lease at some point after January 1, 2015.

(Doc. 126-2 at 2–3.) As of the date of his initial report, Mr. Moores had "identified approximately 320 persons or entities that have held and/or currently hold the lessor's interests under the applicable oil and gas leases . . . ." (*Id.* at 7–8.) Since then, he has updated the summary with newly identified leaseholders three times and provided Southland with additional title documents "purportedly supporting the chain of title" eight times. (*See* Doc. 118 at 7.)

Using Mr. Moores's lists of identified leaseholders, Plaintiffs' counsel has "made a comparison of persons identified by Mr. Moores as being lessors after January 1, 2015 under 253 of the 325 Leases . . . to persons identified in royalty accounting data produced by Southland . . . ." (Doc. 126-5 at 1.) Similarly, Plaintiffs' counsel also compared Southland's royalty accounting data to the individuals and entities identified as original lessors in the relevant lease agreements, as well as some of their heirs. (*Id.* at 1–2.) Through this process, Plaintiffs' counsel had identified 497 putative class members on February 1, 2019. (*Id.* at 2.)

### C. Southland's Motion to Exclude

Southland argues that Mr. Moores's testimony and report should be excluded for three reasons. First, because "Plaintiffs failed to comply with this Court's expert deadlines with respect to the disclosure of Mr. Moores'[s] expert report and supporting facts and data." (Doc. 118 at 6.) Southland argues that Mr. Moores's updated exhibits provided after his deposition and after the expert report deadline have resulted in Southland being "prejudiced and surprise[d] . . . as Plaintiffs continue to repeatedly 'update' the Moores Report." (*Id.* at 7.) Southland argues that this has turned the report into a "moving target" because "Southland's experts were unable to comprehensively review Mr. Moores'[s] opinions and supporting documents/data in preparing their own opinions." (*Id.* at 8.) Plaintiffs respond that they timely disclosed Mr. Moores's report on November 2, 2018,

6

and have continued to supplement the summary attached to his report with individual leaseholders identified using the same title examination methodology laid out in the report, as required by Federal Rule of Civil Procedure 26(e)(2). (Doc. 126 at 5–6.) Asserting that supplements to the report may be provided up to the pretrial disclosure deadline, Plaintiffs claim that Moores has until 30 days before the class certification hearing to submit updates to his initial report. (*See id.* at 6.)

Second, Southland argues that Mr. Moores's opinions are unreliable. (Doc. 118 at 9.) Southland asserts that Mr. Moores fails to consider relevant documents, that he does not utilize reliable principles and methods consistent with industry custom and practice, and that his results contain numerous deficiencies. (*Id.* at 9–16.) Southland provides an affidavit from its own title examination expert, attorney George Snell, who reviewed Mr. Moores's report and casts doubt on the reliability of its methodology and results. (*See* Doc. 118-4.) For example, Southland takes issue with Mr. Moores's decision to use the grantor/grantee index for his title review rather than a tract index. (*See* Doc. 118 at 11 ("Mr. Moores'[s] failure to use the more effective tract index is without explanation considering the inherent weaknesses of the grantor/grantee index that affect accuracy.") Southland also argues that Mr. Moores's work is not reliable because he has not documented the chains of title using a "run sheet" describing intermediate conveyances and transfers. (*See id.* at 13 ("Mr. Moores'[s] failure to document the details relating to each link in the chain of title would be unacceptable in any title examination required in the industry for other purposes . . . . [A] landman traditionally prepares a 'run sheet.'").)

Plaintiffs counter that Mr. Moores's "opinions are reliable in every respect." (Doc. 126 at 7.) They assert that that Mr. Moores has "properly and reliably identified" relevant leaseholders "which has substantially contributed to the Plaintiffs' identification of approximately five hundred members of the class." (*Id.* at 1.) Plaintiffs' counsel aver that they will be able to use additional

7

documents to fill in the gaps that Mr. Moores described as impacting his ability to identify each and every individual with a lessor's interest in the relevant agreements. (*See id.* at 7–8.) According to Plaintiffs, "[t]he fact that there are other available methods for identifying such lessors does not mean that the method used by Moores is unreliable, or that Moores'[s] identification of the post-January 1, 2015 lessors is inaccurate in any material respect." (*Id.* at 9.)

Finally, Southland argues that Mr. Moores's report is not relevant to the class certification issue because it "fails to link the royalty owners paid by Southland to the owners identified from his title examination" and thus is "irrelevant to a determination as to the members of the proposed class." (Doc. 118 at 17.) In response, Plaintiffs maintain that Mr. Moores "was never asked, as part of his assignment, to actually identify persons who were members of the Class[,]" but that Plaintiffs' counsel have compared his leaseholder findings with Southland's royalty data to identify the class. (*See* Docs. 126 at 5; 126-5.)

## II. Legal Standards

### A. Legal Standard for the Admission of Expert Testimony

As part of its evidentiary gatekeeping function under Federal Rule of Evidence 702, the Court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (extending the *Daubert* standard for evaluating scientific expert testimony to "technical" and "other specialized" knowledge). This requires a two-step inquiry, first determining whether the proffered expert is "qualified by 'knowledge, skill, experience, training, or education' to render an opinion." *103 Inv'rs I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (quoting Fed. R. Evid. 702). Second, the Court must determine whether the proposed testimony "is sufficiently 'relevant to the task at hand[,]'"

8

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 597), and has "a reliable basis in the knowledge and experience of [the expert's] discipline[,]" *Daubert*, 509 U.S. at 592.

Federal Rule of Evidence 702 codifies the elements laid out in *Daubert* and *Kumho Tire Co.* that are required to meet the second prong of the Court's gatekeeping inquiry—relevance and reliability. Rule 702 provides that a qualified expert witness may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 592–97; *Kumho Tire Co.*, 526 U.S. at 141–42.

While "[t]he proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible[,]" *Student Mktg. Grp., Inc. v. Coll. P'ship, Inc.*, 247 F. App'x 90, 101 (10th Cir. 2007) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001)), the Court has "wide latitude . . . in exercising its discretion to admit or exclude expert testimony." *Bitler*, 400 F.3d at 1232. In a bench trial or other setting where the Court sits as the finder of fact, "while *Daubert's* standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise . . . ." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) (citation omitted).

**B. Legal Standard for Class Certification**

Mr. Moores's expert testimony is being proffered and challenged solely as it relates to the upcoming class certification hearing and the Court's determination of whether the putative class should be certified. The party seeking class certification bears the burden of "affirmatively demonstrat[ing] . . . compliance" with each required element in Federal Rule of Civil Procedure

9

23, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), subject to "a strict burden of proof," *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988) (citations omitted).

Rule 23 dictates that all classes must meet four prerequisites: (1) numerosity rendering joinder impracticable, (2) commonality of questions of law and fact, (3) typicality of the named plaintiffs' claims and defenses compared to those of the putative class members, and (4) adequacy of the named plaintiffs to represent the entire class. *See* Fed. R. Civ. P. 23(a). Plaintiffs bring their motion for class certification under Rule 23(b)(3), which is proper when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3).

Though not an explicit requirement under Rule 23, an important element of class certification is that the potential class members can be objectively and easily ascertained. *See Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 254 (D.N.M. 2016) (collecting cases from various districts describing the "ascertainability requirement"); *see also Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) ("a plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly ascertainable'" (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012))). "A class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 2026 (2018) (citations omitted).

### III. Analysis

#### A. Mr. Moores is qualified as a title examination expert and his testimony is relevant.

Southland does not challenge Mr. Moores's qualifications, and the Court finds that he is qualified as an expert in oil and gas title examination and land work. (*See* Docs. 126-3; 126 at 3.)

The Court also finds that Mr. Moores's report and testimony will be relevant to its determination of whether class certification is appropriate, particularly regarding the issue of ascertainability. The Court is not persuaded by Southland's arguments that Mr. Moores's report is completely irrelevant to certification because he did not complete the entire task of identifying putative class members. (*See* Doc. 118 at 16–18.) Plaintiffs clearly explain how their counsel utilized Mr. Moore's findings to cross-reference Southland's royalty accounting data and identify putative class members (*see, e.g.*, Doc. 126 at 5), and do not claim that the leaseholders Mr. Moores has identified through his chain of title work make up their putative class. Whether objective criteria may be used to adequately ascertain members of the proposed class is an element the Court will consider in determining whether certification in appropriate in this case. *See Abraham*, 317 F.R.D. at 254. As Plaintiffs have relied on Mr. Moores's report to identify a list of putative class members, his report is relevant to the Court's ascertainability analysis.

### B. Mr. Moores's report is sufficiently based on reliable data, methods, and principles.

Finding that Mr. Moores is qualified and his opinions are relevant to class certification, the Court must next decide whether his expert opinions have "a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. As discussed in more detail below, the Court finds that Mr. Moores's opinions and report are reliable enough to be admitted as expert testimony under Rule 702. However, the Court will hear further arguments at the upcoming class certification hearing as to the alleged shortcomings that Southland has raised in regard to Mr. Moores's findings, such as their accuracy, reliability, and lengthy delay in completion. (*See generally* Doc. 118.) Further exploration of these issues will help the Court determine how much weight to give Mr. Moores's findings in deciding whether the putative class "may be identified by reference to objective criteria." *See McKeage*, 847 F.3d at 998.

Mr. Moores's report lays out the facts and data upon which it is based and the principals and methods he applies in conducting his research. Mr. Moores began with a list of lease agreements Southland produced during discovery, of which Plaintiffs' counsel highlighted the leases containing relevant royalty provisions. (*See* Doc. 126-2 at 3–4.) Mr. Moores and his team then tracked down documents related to these lease agreements that are located in the official grantor/grantee indexes in San Juan and Rio Arriba Counties. (*Id.*) Despite Southland's concerns about whether this is the most effective way to trace lessors' interests, Mr. Moores's chain of title process as laid out in his report satisfies the Court that his opinions meet the Rule 702 requirement that expert opinions be "based on sufficient facts or data." *See* Fed. R. Civ. P. 702(b). Similarly, Mr. Moores's method of identifying post-2015 leaseholders—following the "chain" of lessors' interests in each lease through the official county grantor/grantee indexes—appears to be a sufficiently reliable method that Mr. Moores has reliably applied to the leases at issue. *See* Fed. R. Evid. 702(c)–(d). (*See also* Doc. 126-2 at 5–6.)

Still, Southland has raised some compelling concerns about the adequacy and reliability of Mr. Moores's findings, and, as a result, Plaintiffs' ability to adequately ascertain their putative class based on his opinions. Southland has correctly pointed out that Plaintiffs failed to address or rebut many of the alleged deficiencies that Southland specifically pointed out in Mr. Moores's report. (*See* Doc. 141 at 1.) For example, Southland's title examination expert, George Snell, opines that Mr. Moores's practice of listing only the original and current lessor under each lease, without documenting a complete chain of title connecting the two, falls short of industry standards for chain of title work. (*See id.* at 2; Doc. 118 at 12–13.) Plaintiffs' response does not directly address this alleged deficiency.

Plaintiffs must be prepared to address this question of adequate documentation at the class certification hearing, as it will affect how much weight the Court will give to Mr. Moores's expert opinions. Plaintiffs should also be prepared to respond to other questions of reliability Southland has raised, including: the propriety of using a grantor/grantee index for this research rather than a tract index (*see id.* at 11–12), whether Mr. Moores has adequately reviewed the work of the other landmen he hired to help complete Plaintiffs' title examination job (*id.* at 16), whether his report inaccurately identifies working interest owners as original owners (*see* Doc. 141 at 3), and whether Mr. Moores's identification of original leaseholders as current leaseholders in absence of recorded conveyance or assignment documentation stating otherwise is a reliable method of tracing chain of title (*see* Doc. 118 at 13–15). Counsel's arguments on these issues will bear strongly on the Court's analysis of the weight it should give Mr. Moores's report in determining whether the proposed class should be certified. However, the Court is not prepared at this stage to completely exclude Mr. Moores's report and testimony simply because a different title examination expert opines that there are other ways of completing chain of title work that may be better or more reliable. There is no risk here that unreliable expert opinions will taint a jury, and the Court will be capable of assessing the relative reliability and weight of Mr. Moores's opinions.

**C. The supplements to Mr. Moores's report are not new opinions.**

Finally, the Court will not exclude Mr. Moores's report and testimony based on his subsequent updates to the summary of identified leaseholders. Southland relies on *Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003), to argue that "Rule 26(e) does not contemplate that a party can disclose an incomplete report, knowing that it will be supplemented numerous times thereafter . . . ." (Doc. 141 at 4.) In *Beller*, the court held that an expert witness's "supplemental expert report" was inadmissible because it "was filed beyond the dates imposed by the Court's

13

deadline; it was filed without [the plaintiff] having sought or obtained leave of the Court to modify case management deadlines; and the opinions expressed in the supplemental report [were] different than the opinions contained in [the original] report." *Beller*, 221 F.R.D. at 702. *Beller*, however, was a wrongful death claim that did not involve class certification, and the expert's supplemental report changed calculations of lost earnings and other economic loss figures without adequately explaining why, or what changes in methodology led to his new opinions. *Id.* at 697–700.

The Court finds that in the class certification context, the use of expert witness testimony to argue that a putative class may be objectively and easily ascertained does not necessarily require the proponents of certification to have identified each and every member of the putative class by the date expert reports are due. And, unlike in *Beller*, where the plaintiff "fail[ed] to explain why information which was readily available prior to [the expert's initial] report was not considered or utilized in that original report," *see id.* at 697, Plaintiffs have made it clear that the reason Mr. Moores's summary of findings continues to be updated is due to "the extensive amount of work involved to properly identify all the subject lessors." (*See* Doc. 141 at 4.) The Court acknowledges the complexity of this process. While the fact that individual title examination is such a lengthy endeavor may be a valid argument that the putative class is not easily ascertainable, it is not a strong argument for excluding Mr. Moores's expert findings in their entirety.

Further, the updates to Mr. Moores's report do not serve to "deepen and strengthen" the initial report, as Southland claims. (*See id.* at 5 (quoting *Beller*, 221 F.R.D. at 701) (internal quotation marks omitted).) Instead, they simply add additional individuals and entities to his list of leaseholders that were identified using the methodology outlined in his report. While it would have been ideal if Mr. Moores had completed all the relevant title examination work by November 2, 2018, his initial report explaining his methodology and including a summary of his then-current

14

results, even without the updates, will assist the Court in analyzing whether Plaintiffs' list of putative class members is accurate and reliable. The updates have not added any new information to the report that will dramatically affect the Court's analysis and consideration of Mr. Moores's expert opinions.

Similarly, Southland has not established that each name on Mr. Moores's list is "a separate opinion" that Southland would need to analyze individually in order to argue effectively against certification. (*See* Doc. 141 at 4.) Mr. Snell's expert opinions alleging deficiencies in Mr. Moores's process and many of his individual chains of title will help the Court decide how much weight to give *all* of Mr. Moores's findings—including the summary that was updated using the same process previously reviewed by Mr. Snell. Nor does the Court believe that the supplemental information would have significantly impacted Southland's deposition of Mr. Moores which, based on the excerpts Southland has attached to its motion, focused mainly on his title examination methodology overall and not individual title examinations. (*See* Doc 118-2.) Thus, the updates are not untimely disclosures in violation of Rule 26(a), but proper supplements to Mr. Moores's expert report under Rule 26(e)(2).

**THEREFORE**,

**IT IS ORDERED** that Defendant's *Daubert* Motion to Exclude Testimony of Terry A. Moores (Doc. 118) is **DENIED**.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**