# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**GERALD ULIBARRI,**

      Plaintiff,

v.                                               No: 1:18-cv-294-RB-SCY

**ENERGEN RESOURCES CORPORATION,**

      Defendant.

## MEMORANDUM OPINION AND ORDER

This oil and gas royalty dispute centers on the interpretation of leases providing that royalties should be paid on the "proceeds from the sale of the gas, as such." The Court concludes that this language is ambiguous when describing the point at which the "proceeds" should be calculated—either "at the well" or at the downstream point where the gas is actually sold. It is similarly unclear whether the language requiring royalty payments to be made on "proceeds from the sale of gas" requires paying royalties on gas used as in-kind payments to third-party processing facilities prior to an actual sale generating "proceeds." The Court thus denies the parties' motions for summary judgment on these issues, but will grant Plaintiff's motion to the extent that his claims under the New Mexico Oil and Gas Proceeds Payment Act (OGPPA) are not barred merely because the leases were originally executed prior to the Act.

**I.    Background**

Plaintiff brings this putative class action on behalf of himself and other similarly situated lessors to recover proceeds they are allegedly owed under royalty agreements with Defendant Energen Resources Corporation (Energen), the lessee. Plaintiff filed both his original Class Action Complaint (Doc. 1) and his First Amended Class Action Complaint (Doc. 3 (Am. Compl.)) on March 29, 2018, and filed the currently operative Second Amended Class Action Complaint on March 4, 2019. (Doc. 74 (2d Am. Compl.).) Plaintiff asserts two claims for relief: (1) that Energen

breached its obligations under the leases "by failing to pay royalties based upon the proceeds received on the sale of residue gas, natural gas liquids [(NGLs)] and condensate which came from the gas wells subject to Plaintiff's and the Class members' Royalty Agreements[,]" and (2) that Energen has violated the OGPPA by allegedly underpaying royalties and by failing to make timely payments. (*Id.* ¶¶ 39, 41–44.)

The Second Amended Complaint defines the putative class as "[a]ll persons and entities to whom Energen paid royalties on natural gas produced by Energen from wells located in the state of New Mexico between March 29, 2012 and May 31, 2015, pursuant to leases or overriding royalty agreements (collectively, 'Royalty Agreements') which contain" one of four different royalty payment provisions. (*See id.* ¶ 1.) Plaintiff claims that language in each of the four categories of royalty provisions set forth in the class definition prohibit Energen from deducting post-production costs from its royalty payments.[1] However, only one of the four types of royalty provisions is relevant to the parties' cross-motions for summary judgment. Plaintiff's two leases with Energen include "Proceeds Royalty Provisions," which require payment of "a specified percentage of the proceeds of the gas, as such, for gas from wells where gas only is found."[2] (*Id.*)

The putative class definition specifically excludes any individuals or entities whose lease agreements provide for royalty payments based on "market value at the well," "the prevailing field market price," or any other agreement language stating that value should be calculated "at the well." (*Id.*) These exclusions are necessary because in *Anderson Living Trust v. Energen Resources Corp.*, the Tenth Circuit held that the "marketable condition rule" does not apply in New Mexico—

---

[1] The Court will take up the question of whether this proposed class meets the requirements of Federal Rule of Civil Procedure 23 at a separate hearing on Plaintiff's motion for class certification. (*See* Doc. 76.)

[2] Plaintiff has given royalty provisions containing such language the short title "Proceeds Royalty Provisions." The Court will adopt this term for ease of reference, but notes that neither Energen nor the leases themselves utilize this term.

meaning lessees *can* "deduct[] from [lessors'] royalty payments their proportionate share of post-production costs—those costs necessary to make the gas marketable." 886 F.3d 826, 831 (10th Cir. 2018). Natural gas is often not marketable when it is first produced (i.e., "at the well"). *See id.* at 832. Thus, when a lease agreement calls for royalties to be calculated based on the value of the gas at the well, producers must determine this value using a "netback" or "workback" method of calculation. *See id.* at 832–33. This involves calculating a price for the natural gas "at the well" by selling the natural gas after it has been processed into marketable condition, then deducting the post-production costs that were necessary to prepare it for sale to actually earn that value. *See id.* at 832 (explaining that the leases in *Anderson Living Trust* "set the basis for royalty payments as the 'market value at the well' or the 'prevailing field market price.' Determining those amounts, however, is not straightforward, because Energen does not sell the gas it produces on these leased properties 'at the well'" (citations omitted).)

The Second Amended Complaint thus asserts that while post-production costs may be deducted when the lease requires calculating royalties based on proceeds "at the well," it is still improper to deduct post-production costs from royalties paid under all those leases that don't specify "at the well" valuation and simply provide for payments to be made on proceeds from the sale of gas. (*See* Doc. 74 ¶¶ 19–30.) Instead, under those types of leases, Plaintiff asserts Energen should base payments on the actual sales proceeds of the natural gas and related products derived from its wells. (*See id.*)

## II.  Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. The moving party bears the initial responsibility of showing "an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citation and quotation marks omitted).

### B. Oil and Gas Lease Interpretation

"In New Mexico, oil and gas leases are interpreted under the same principles as any other contract." *King v. Estate of Gilbreath*, 215 F. Supp. 3d 1149, 1164 (D.N.M. 2016) (citing *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 852 (N.M. 2013); *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993); *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1112 (10th Cir. 2005)). "The primary objective in construing a contract is to ascertain the intention of the parties." *Continental Potash, Inc.*, 858 P.2d at 80 (quoting *Mobile Inv'rs v. Spratte*, 605 P.2d 1151, 1152 (N.M. 1980)).

When a contractual provision is in dispute, courts must first determine if the provision is ambiguous. "If a court concludes that there is no ambiguity, the words of the contract are to be given their ordinary and usual meaning[,]" *Lyons*, 299 P.3d at 852 (quotation omitted), and the court "is limited to interpreting the contract which the parties made for themselves [as a court]

4

may not alter or make a new agreement for the parties." *King*, 215 F. Supp. 3d at 1164 (quoting *Lyons*, 299 P.3d at 852). When contractual language *is* ambiguous, "the jury (or the court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding issues of breach and damages." *C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238, 243 (N.M. 1991) (citation omitted).

"Whether a contract contains an ambiguity is a matter of law . . . ." *Lyons*, 299 P.3d at 852. "A contract term may be ambiguous if it is 'reasonably and fairly susceptible [to] different constructions.'" *Id.* (quoting *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993)). "The standard to be applied in determining whether a contract term is ambiguous and is subject to equally logical but conflicting interpretations is the same standard applied in a motion for summary judgment." *Id.* at 849 (quoting *Randles v. Hanson*, 258 P.3d 1154, 1162 (N.M. 2001) (quotation marks and brackets omitted)). Thus, a court should only consider a provision unambiguous "when the 'evidence presented is so plain' that it is only reasonably open to one interpretation." *Id.* (quoting *Randles*, 258 P.3d at 1162). In making this determination, "courts may consider 'evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance.'" *Id.* (quoting *C.R. Anthony Co.*, 817 P.2d at 242–43). "[I]f the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact-finder . . . ." *Id.* (quoting *Mark V*, 845 P.2d at 1235).

### III. Analysis

Energen seeks summary judgment on both Plaintiff's claims—arguing (1) that it did not breach its contracts as a matter of law, and (2) that the OGPPA does not apply to Plaintiff's leases. (*See* Doc. 70.)

### A. The Court will deny summary judgment as to the correct interpretation of the point of valuation in Plaintiff's leases.

Energen argues that Plaintiff's leases clearly provide that royalties should be paid only on the proceeds of gas that is actually sold and should be calculated on the value of the gas "at the well." (*Id.* at 10–13.) Further, it asserts that the circumstances in 1953 when the parties' predecessors in interest executed the leases supports this interpretation (*id.* at 13–15), and that Plaintiff's course of performance in accepting Energen's calculation method from 2007 to 2015 "supports Energen's interpretation of [the] leases." (*Id.* at 15.)

Plaintiff counters in his cross-motion for summary judgment that caselaw discussing similar lease provisions proves that his leases require royalty payments to be based on the actual sales proceeds without any post-production deductions. (Doc. 89 at 9–14.) He also asserts that Energen's proffered evidence of custom and practice in the oil industry at the time the leases were executed is inadmissible as a matter of law, in part because the opinions proffered by Energen's expert witness, Kris Terry, are not sufficiently supported by a reliable foundation. (*Id.* at 17–21.) Finally, Plaintiff objects to Energen's attempt to use course of performance evidence to make its case for summary judgment, arguing that it is legally irrelevant as he "was not one of the five original lessors to the Ulibarri Leases . . . ." (*Id.* at 22.)

As the plain language of the leases do not specify a point of valuation, the circumstances surrounding the negotiation of the contracts in 1950s and the meaning at that time of relevant terms like "proceeds" and "as such" are critically important to the determination of whether the contract dictates that royalty payments should be calculated at the well or at a downstream point of sale. *See C.R. Anthony Co.*, 817 P.2d at 243 (quoting *Mark V*, 845 P.2d at 1235). However, as described below, the evidence presented by both parties in support of their respective positions is "in dispute,

turns on witness credibility, [and] is susceptible of conflicting inferences . . . ." *See Mark V*, 845 P.2d at 1235. Thus, the Court finds that the language is ambiguous as a matter of law.

### i. The plain language is susceptible to conflicting inferences.

Plaintiff holds the lessor's interest in two leases, both executed in 1953, which provide that "[t]he lessee shall pay lessor, as royalty, one-eighth of the proceeds from the sale of the gas, as such, for gas from wells where gas only is found . . . ." (2d Am. Compl. ¶¶ 8, 10.) Considering this language on its face, the provisions do not unambiguously provide either that Plaintiff must calculate the value of the gas at the well *or* that royalty payments must be calculated at the first point of sale. While the mere use of the word "proceeds" without further specification could indeed be logically read to mean the actual proceeds realized the first time the gas is sold, the phrase "gas, *as such*," does seem to indicate some particular state or condition of that gas. It is quite possible that "gas, as such" could refer to unprocessed gas at the wellhead. But the Court is not familiar with the particular meaning of the term "as such," if any, in the oil and gas industry and finds both interpretations equally plausible.

### ii. Caselaw provides no binding guidance.

No New Mexico court has interpreted the phrase "gas, as such" in the context of a natural gas lease, nor has the Tenth Circuit. Several non-binding cases, however, are relevant to the question of whether, in the mid-20th century when Plaintiff's predecessors in interest executed the relevant leases, the phrase "gas, as such" referred to gas sold and valued at the wellhead. In *Matzen v. Hugoton Production Co.*, the Kansas Supreme Court considered the proper method of calculating royalty payments under Proceeds Royalty Provisions in a case where both parties had already agreed "that Hugoton's royalty obligation [was] to be determined at the wellhead rather than at the point of sale and delivery off the lease . . . ." 321 P.2d 576, 580 (Kan. 1958).

7

Though point of valuation was not in dispute, the court noted that in Grant County, Kansas in 1941 "[w]hen plaintiffs' leases were executed it was the established custom and practice in the field to measure, determine the price, and pay royalty at the wellhead for gas produced. Pipe-line facilities did not exist and there was no general market for gas in the area." *Id.* at 581–82. *See also Lone Star Gas Co. v. Murchison*, 353 S.W.2d 870, 875 (Tex. Civ. App. 1962) ("[a] distinction . . . must be applied between the status of natural gas, as such, and 'extraneous gas[,]' . . . which means gas which has been produced elsewhere" and is no longer in its "natural state"); *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 341 (D.N.M. 2015) (finding tentatively for class certification purposes that "[i]n some quarters of the oil-and-gas industry, the term 'as such,' when used with reference to royalty based on 'proceeds derived from the sale of gas, as such,' means from the sale of the gas in the condition that it is as it emerges from the well").

In *Barby v. Cabot Corp.*, the Tenth Circuit examined various lease provisions, including Proceeds Royalty Provisions, and concluded that "royalties were to be paid on all gas marketed at the wellhead, or if marketed off the premises, royalties on the market value at the well." 465 F.2d 11, 13 (10th Cir. 1972). The plaintiffs had conceded, however, "that under the leases the royalties are to be paid on the basis of the market value of the gas at the well[,]" and the case actually involved a wellhead market for gas. *Id.* at 14–15. *See also Lightcap v. Mobil Oil Corp.*, 562 P.2d 1, 9, 11 (Kan. 1977) (holding that under Proceeds Royalty Provisions "royalties . . . are to be paid on amounts actually received and lawfully retained by the producer[,]" but also noting that "all sales by the producer were made at the wellhead").

In *Emery Resource Holdings, LLC v. Coastal Plains Energy, Inc.*, a United States Magistrate Judge considered various oil and gas leases that had been executed in Utah between 1952 and 1982. 915 F. Supp. 2d 1231, 1233–35. (D. Utah 2012). The court reasoned that "the

qualifying phrase 'as such, for gas from wells where gas only is found' can be reasonably and fairly construed to mean the sale of the gas 'as such' or, in other words, in the condition in which the gas is found when produced 'from' the wells." *Id.* at 1238. The Court reached this conclusion by "attempt[ing] to harmonize all of the contract's provisions and all of its terms . . ." and concluding that the parties "could not have reasonably intended . . . the Subject Leases [to be] left without a defined royalty valuation point or with a royalty valuation point that can change over time." *Id.* at 1241–42.

Additional non-binding caselaw, on the other hand, suggests that identical lease provisions are much more ambiguous when it comes to the point at which royalty payments should be calculated. *Ladd v. Upham* offers the most support for Plaintiff's position that the lease language unambiguously refers to actual proceeds at whatever point they are earned, rather than a wellhead calculation. 58 S.W.2d 1037 (Tex. Civ. App. 1933), *aff'd*, 95 S.W.2d 365 (Tex. Comm'n App. 1936). In *Ladd*, the relevant lease was executed in 1929 and included a Proceeds Royalty Provision. *Id.* at 1038. *Id.* The court held that:

> The lessee under the terms of the lease was given full power and control of the entire production and if in order to obtain a better price for the gas he chose to construct pipe lines or otherwise convey it to a point or points beyond the lease and thus receive greater profit, he could do so but could not escape the obligation in favor of the lessor imposed by the terms of the lease. . . . Unlike leases of a familiar form, there was no reservation of title to gas produced from the well but full right and power of disposition thereto was vested in the lessee . . . .

*Id.* at 1038–39.

Three years later, however, the Texas Commission of Appeals affirmed the lower court's decision to allow the case to proceed to trial, but walked back the significance of its lease interpretation by "pretermit[ting] any discussion of the provisions of the contract in advance of a trial on the merits." *Upham v. Ladd*, 95 S.W.2d at 366. The Commission of Appeals explained that

9

"it [was] not possible in the present state of the record to construe the lease contract sued upon unaided by pleading and proof defensively of the surrounding facts and circumstances attending its execution." *Id.* This holding illustrates the court's discomfort with analyzing a Proceeds Royalty Provision without any extrinsic evidence regarding the execution of the contract or the typical usage and custom at the time the parties entered into the lease.

Other cases further support the conclusion that Proceeds Royalty Provisions are susceptible to multiple interpretations. *See West v. Alpar Resources, Inc.*, 298 N.W.2d 484, 485–86, 490 (N.D. 1980) (finding a Proceeds Royalty Provision ambiguous because it "simply provides that the lessor is entitled to receive 'one-eighth of the proceeds from the sale of the gas' without further explanation[,]" and noting that "[r]ational arguments can . . . be made to support the view that the royalty obligation is to be determined at the wellhead as well as to support the view that the royalty obligation is to be determined at the location of the sale of the gas"); *Foster v. Merit Energy Co.*, 282 F.R.D. 541, 557 (W.D. Okla. 2012) (reasoning in the class certification context that the plaintiff's "royalty clause specifie[d] no geographic point of valuation for 'gas, as such, for gas from wells where gas only is found'").

Finally, the Court notes that a single sentence in an unpublished Tenth Circuit Order and Judgment, citation to which the court itself "generally disfavors," is not sufficient proof of the circumstances surrounding the execution of Plaintiff's underlying leases to justify summary judgment in Energen's favor. Energen cites *Hagood-N.M. Tr. No. 1 v. Phillips Petroleum Co.*, along with Ms. Terry's expert testimony described below, to support the proposition that in the San Juan Basin in 1953 all produced gas was sold at the wellhead. 17 F. App'x 813, 814 (10th Cir. 2001) ("Contracts are construed in the context of the existing facts and circumstances, and in 1953 the gas from these properties was being produced and sold to pipelines at the wellhead.") Though

this statement provides some persuasive support for Energen's position, *Hagood* is a three-paragraph, unpublished order lacking citation and focused on interpreting the lease language "as produced" and "at the time of production." *See id.* The Court does not consider *Hagood* to be such definitive proof of circumstances in the San Juan Basin at the time the parties executed the underlying leases that they are rendered unambiguous.

### iii. The facts drawn from Ms. Terry's expert report are genuinely disputed.

Energen also offers Ms. Terry's expert opinions as evidence that "it is indisputable that when Ulibarri's leases were executed in 1953, most gas produced in the San Juan Basin was sold at the physical location of the wellhead." (Doc. 71 at 13 (citing Doc. 71-5 ¶¶ 21, 35).) For example, Ms. Terry opines that "[a]t that time, the natural gas produced from Plaintiff's leasehold would have been sold at the physical location of the wellhead, because [Energen's predecessor in interest] Stanolind did not own any processing plant or other facilities to sell gas downstream from the physical location of the wellhead." (Doc. 71-5 ¶ 35.) Plaintiff vehemently objects to these facts as stated by Ms. Terry, disputing all of Southland's material facts that are based on her opinions and arguing that they are irrelevant, inadmissible, and lack proper foundation. (Doc. 89 at 3–5.)

The Court concludes that, while Ms. Terry is qualified as an expert in this case,[3] Energen has failed to show that the opinions contained in her report are reliable and relevant enough to render them genuinely undisputed for purposes of summary judgment. Ms. Terry's affidavit states

---

[3] This Court determined that Ms. Terry is qualified to offer her opinions on "the customs and practices, usage of terms, and historical context and circumstances in the oil and gas industry that have developed to shape common understanding of oil and gas agreements." (See Doc. 91 at 1 (incorporating by reference 16cv215, Ulibarri v. Southland, Doc. 151).) However, the Court previously ruled on the admissibility of Ms. Terry's testimony solely in the class certification context, explaining that Plaintiff "may again move to exclude Ms. Terry's expert testimony after the class certification stage, at which time many of their objections . . . would be more properly before the Court." (16cv215, Doc. 151 at 13.) Energen is now offering Ms. Terry's expert opinions as evidence that Plaintiff's contract language unambiguously proves that its "at the well" interpretation is correct (*see* Doc. 71 at 11, 13–15), and the credibility and weight of Ms. Terry's testimony play a much more important role at this stage.

11

that she "reviewed and examined documents, records, and data that relate to Energen's operations and production during the period at issue." (*See* Doc. 71-5 ¶ 4.) She also notes that she is "familiar with and has independently researched the history of the development of the oil and gas industry in the State of New Mexico[,]" and while she "cited the principal sources that form the basis for [her] opinions[,]" she also "relied on [her] direct, personal experience marketing natural gas in New Mexico." (*Id.*) Ms. Terry indeed cites very few elements of the historical record upon which she relied. (*See generally* Doc. 75-1.) Though her previous research experience and "direct, personal experience" may very well render her opinions reliable enough to aid in the interpretation of the ambiguous leases, the record at this stage simply does not provide enough evidence for the Court to truly access the reliability, relevance, and credibility of Ms. Terry's opinions.

The standard for determining that a contract provision is unambiguous, like that of summary judgment, is that "no reasonable person would determine the issue before the court in any way but one." *C.R. Anthony Co.*, 817 P.2d at 244. Here, "the proffered evidence is in dispute, turns on witness credibility, [and] is susceptible of conflicting inferences . . . ." *Id.* Thus, the correct interpretation of the leases can only be resolved following further evidentiary development, which may include cross examination to elucidate the basis and weight of Ms. Terry's opinions. *See Loretto Mall Partners*, 817 P.2d at 244; *see also Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) ("[i]t is within the discretion of the trial court to determine *how* to perform its gatekeeping function under *Daubert*[,] . . . and a judge may fulfill his gatekeeper obligation . . . during trial . . . so long as the court has sufficient evidence to perform the task' of ensuring reliability and relevance") (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000); discussing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).

As discovery regarding class certification has been bifurcated from discovery on the merits in this case (*see* Doc. 27), both parties will have an opportunity to further develop the record on the issue of how the ambiguous lease language should be interpreted. The Court will deny both parties' motions for summary judgment on this issue.

### iv. The parties' course of performance does not render the contract unambiguous.

Energen states that "[t]he parties' course of performance is relevant to understanding the meaning of their agreement." (Doc. 71 at 15 (citations omitted).) Both cases it cites to support this proposition, however, explain that course of performance is relevant to determining as a matter of law whether the contract is *ambiguous*. *See Farmington Police Officers Ass'n v. City of Farmington*, 137 P.3d 1204, 1212 (N.M. 2006) (holding that the lower court erred in granting the plaintiff's motion for summary judgment and should have considered course of performance evidence to determine if the contract was ambiguous); *Lyons*, 299 P.3d at 851–53 (affirming the trial court's determination that course of performance was relevant to concluding that the lease was unambiguous as a matter of law).

The Court need not take a position here on the parties' dispute over whether it is the course of performance of the original parties to the contract that matters, or whether Plaintiff's course of performance in accepting Energen's royalty calculation for years without objection bears on the ambiguity of the contract. (*Compare* Doc. 89 at 22, *with* Doc. 100 at 11–12.) If evidence of Plaintiff's course of performance in accepting Energen's payments is irrelevant, the Court still concludes that the lease is ambiguous for the reasons described above. If Plaintiff's course of performance *is* relevant, the Court concludes that his failure to object to Energen's payment method until 2015 does not prove the contract is unambiguous, as it is not clear from the record that Plaintiff had experience in the industry suggesting he understood and acquiesced to how his

13

payments were being calculated. (*See* Doc. 89-10 ¶ 2 ("I have an eighth grade education. Since I completed eighth grade, I have been engaged in farming . . . .").)

In a similar case where the Tenth Circuit considered course of performance evidence to show that the plaintiffs had "*knowingly* received prices lower than the 1984 regulated price for more than eight-and-a-half years" without objection, the court also explained that they were "experienced professionals in the oil and gas business." *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1168 (10th Cir. 1999). The court also noted that "[o]ver the years, the [plaintiffs] exhibited aggressive attention to their oil and gas contracts and leases, suing to enforce rights under such contracts or leases at least eight times, including this litigation." *Id.* at 1168, n.12. No such scenario exists here, and the fact that Plaintiff previously received royalties from Energen under the calculation method he now objects to does not render the contract language unambiguous.

**B. The Court will deny summary judgment on Energen's claim that in-kind payments are not "proceeds" upon which it must pay royalties.**

After Energen produced gas from the wells subject to Plaintiff's leases, it contracted with a third-party processing company, Enterprise, to gather and compress the gas and prepare it for sale by extracting NGLs. (Doc. 71 ¶¶ 8–9.) In exchange for these services, Enterprise retained 25% of all the NGLs recovered from the gas, as well as 100% of the drip condensate[4] recovered during processing and other set fees. (*See* Doc. 71-7 at 3–5.) Plaintiff contends that, while his leases do include a "Free Fuel Use provision" that allowed Energen "to use gas as fuel for certain natural gas operations[,]" that provision did not extend to compensating Enterprise in-kind with natural gas products. (Doc. 89 at 21 ("Energen had no right under the Ulibarri Leases to use NGLs and

---

[4] "Drip condensate is the portion of a gas stream that becomes liquid during the transmission of the gas from [the leased premises] to a processing plant." *Lyons*, 299 P.3d at 856 (quotation omitted).

14

drip condensate from the Ulibarri wells to pay Enterprise for its processing services, without properly paying Ulibarri for his royalty share of the proceeds received on the sale of such NGLs and drip condensate.").) Plaintiff argues that "such compensation is part of the post-production costs which Energen is not entitled to deduct in calculating royalties paid to Ulibarri." (*Id.* at 22.) Energen argues that it "owes royalty only on proceeds received from the '*sale* of the gas[,]'" so "as a matter of the leases' plain language, therefore, Ulibarri was not entitled to additional royalties on gas or NGLs that Energen never sold." (Doc. 71 at 10.)

Plaintiff's position in this royalty dispute is clear—he believes that his royalties should be calculated as a percentage of the full amount of proceeds Energen actually receives for selling the natural gas and associated natural gas products derived from his leases. If Plaintiff ultimately prevails on this claim, he has a logical argument that the "in-kind" payments of natural gas products to Enterprise are "post-production costs" that should not be deducted from his royalty payments. Since in-kind payments are technically not "deducted" from Plaintiff's royalty payments on the back end, a determination that Energen cannot pass along *any* post-production costs to Plaintiff would likely require a calculation of the value of the in-kind payments and the addition of those values to Plaintiff's royalty payments. In keeping with Plaintiff's overarching claim that he is not required to bear the cost of *any* post-production activities, it would be improper to grant summary judgment to Energen on this issue before determining which party's point of valuation argument ultimately prevails.

On the other hand, Energen makes a compelling point that the plain language of Proceeds Royalty Provisions appears to requires a *sale* generating *proceeds* in order to trigger royalty payments, and that Plaintiff is not entitled to such payments on gas that is never actually sold. While this argument makes sense in the abstract, it is unclear to the Court whether the parties

15

would have intended to draft their contract language to incentivize the producer's use of gas for in-kind processing payments over sales generating proceeds that would benefit both lessee and lessor. Indeed, as Plaintiff points out, the leases specifically include Free Fuel Use provisions that exempt from royalty payments Energen's own use of gas to fuel its operations, but do not include similar provisions regarding in-kind payments to third parties. (*See* Doc. 89 at 21.) If fuel used by Energen prior to sale would be exempt from royalty payments as a matter of course based on the plain language of the leases, why would the parties include the Free Fuel Use provisions at all?

Lacking knowledge of custom and practice in the industry and the parties' understanding at the time they executed the leases, the Court simply cannot resolve this dispute as a matter of law based on the plain language of the contracts. Like the interpretation of the lease language regarding the proper point of valuation, this issue should be resolved following further development of the record in this case after the class certification phase.

### C. The Court will deny summary judgment on Energen's claim that the OGPPA does not apply to the subject leases, and grant in part Plaintiff's motion on this issue.

Energen next seeks summary judgment on Plaintiff's claim for relief pursuant to the OGPPA, arguing that "where a statute 'makes a substantive change in the rights and obligations of the parties and is remedial in nature, the general rule is that it is presumed to operate prospectively only.'" (Doc. 71 at 16 (citing NMSA 1978, § 12-2A-8 (1997); *Sw. Distr. Co. v. Olympia Brewing Co.*, 565 P.2d 1019 (1977)).) Thus, Energen argues, the OGPPA does not apply retroactively to leases or royalty agreements entered into prior to its enactment." (*Id.*) Plaintiff counters that "[t]here is no provision in the Act which states, or suggests, that the application of the Act should be limited only to payments of proceeds which have been made under leases which are executed after the Act was enacted." (Doc. 89 at 23.)

16

"The [OGPPA] sets forth a derivative remedy that the New Mexico Legislature provides to oil-and-gas royalty owners[,]" but "[i]t will not lie absent a demonstration of a lessee's breach of an underlying agreement with, or duty to, an interest owner." *WPX Energy*, 306 F.R.D. at 434–35 (citing *Elliott*, 407 F.3d at 1120). "The [OGPPA] provides a specific time frame in which lessees on oil-and-gas [leases] must pay royalty interest owners for proceeds they receive[,]" generally within six months of the first sale and no later than forty-five days after the payor receives payment for production. *Id.* at 435 (citing N.M. Stat. Ann. § 70-10-3). "Working interest owners who fail to make payments within § 70-10-3's timeframe incur eighteen-percent interest on the 'unpaid balance due,' unless one of the four exceptions in § 70-10-5 applies . . . ." *Id.* (citing N.M. Stat. Ann. § 70-10-5).

Plaintiff brings his claim for relief under the OGPPA pursuant to § 70-10-5, asserting that from September 1, 2007, to May 31, 2015, "Energen failed to pay the amount of royalties owed to Plaintiff . . . by the date designated in the Royalty Agreement, or within forty-five days after the end of the month in which the sale proceeds on the sale of such gas to third party purchasers were received." (2d Am. Compl. ¶ 43.) Thus, "[p]ursuant to N.M.S.A. 1978 § 70-10-5, Plaintiff and the Class members should be awarded all of the underpaid royalty amounts, together with prejudgment interest at the rate of eighteen percent per year, from the date of each royalty underpayment through the date of final judgment." (*Id.* ¶ 44.)

Energen's argument that the OGPPA does not apply retroactively to Plaintiff's leases relies heavily on *King v. Estate of Gilbreath*, 2016 WL 7496096, at *5. In *King*, United States District Judge Judith Herrera denied summary judgment in a similar dispute, reasoning that "Plaintiffs have not persuaded the Court that the New Mexico Supreme Court would conclude that the OGPPA applies retrospectively." *Id.* In that case, however, the relevant lease had been executed

in 1972, the lease was assigned to the current lessee *prior* to the enactment of the OGPPA in 1985, the lease itself terminated in 1990, and the specific OGPPA amendments creating the substantive rights underlying the plaintiffs' claims had not been enacted until 1991. *Id.* In light of the specific facts in *King*, Judge Herrera correctly concluded that "it does not appear that the OGPPA was intended to apply under the circumstances of this case." *Id.*

However, *King* does not necessarily stand for the proposition that any and all royalty payments made pursuant to a contract originally executed before 1985 are exempt from the OGPPA. In *King*, it was quite reasonable to apply New Mexico's general rule of non-retroactivity when the lease had terminated prior to the relevant statutory amendments and both the execution of the underlying lease and its assignment to the current lessee preceded enactment of the OGPPA itself. *See id.* Here, Plaintiff's underlying leases were executed in 1953 but assigned to Energen in 2007. (*See* Doc. 81 ¶ 9.) The OGPPA had been established law for more than two decades when Energen acquired its interest in the leases, so applying the Act's substantive requirements regarding the timeliness of royalty payments seems quite reasonable and would not "impose significant new duties and conditions and take away previously existing rights." *See Olympia Brewing Co.*, 565 P.2d at 1025; *see also King*, 2016 WL 7496096, at *5 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994) ("stating that presumption against statutory retroactivity is based on the unfairness that results when new burdens are placed on persons after the fact")). Indeed, Judge Herrera explained that she was not persuaded "that the New Mexico Supreme Court would hold that the OGPPA applied retrospectively to a Lease *and assignment* executed before the effective date of the OGPPA." *Id.* (emphasis added).

It is unlikely that the New Mexico legislature intended to exempt all royalty payments from the Act's protections if those payments could be traced back to a contract predating 1985,

18

particularly in light of the fact that the New Mexico Supreme Court has acknowledged that the language of the OGPPA reveals a "strong public policy in favor of establishing the rights of interest owners." *See First Baptist Church of Roswell v. Yates Petroleum Corp.*, 345 P.3d 310, 314 (N.M. 2015). Many interest owners, like Plaintiff, derive their interests from leases that were originally executed long before enactment of the OGPPA. For example, in *Anderson Living Trust*, the Tenth Circuit remanded the plaintiffs' OGPPA timely payment claim to the district court after concluding that "the issue deserve[d] clear resolution." *See* 886 F.3d at 851. Though it does not appear that the defendant in that case made a retroactivity argument, the Tenth Circuit noted that many of the subject leases at issue were "quite old," *id.* at 830, and a review of the underlying complaint reveals that each subject lease was executed prior to enactment of the OGPPA. *See Anderson Living Tr. v. Energen Res. Corp.*, 13cv909, (Doc. 1) (D.N.M. Sept. 20, 2013). The Tenth Circuit's decision thus implies that the OGPPA may apply to leases executed before 1985. The Court will deny Energen's motion for summary judgment on this issue.

**THEREFORE**,

**IT IS ORDERED** that Energen's Motion for Summary Judgment (Doc. 70) is **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's Cross-Motion for Partial Summary Judgment (Doc. 88) is **GRANTED in part** as to the applicability of the OGPPA and **DENIED** as to all other claims.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**